UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CAMERON T. WILLIAMS,                              )
                                                 )
                    Plaintiff,                   )
                                                 )
        v.                                       )   No. 2:22-cv-00181-JRS-MKK
                                                 )
DAVID ARCHER IDOC/WVCF Correction                )
Officer,                                         )
COLE BANTA IDOC/WVCF Correction                  )
Officer,                                         )
JUANITA M. CHATTIN Registered Nurse,             )
Wexford,                                         )
SAMUEL J. BYRD Dr., Wexford,                     )
MICHAEL A. MITCHEFF Dr./Wexford,                 )
THOMAS WELLINGTON Grievance                      )
Specialist - IDOC/WVCF,                          )
WEXFORD OF INDIANA L.L.C.,                        )
CENTURION OF INDIANA,                            )
                                                 )
                    Defendants.                  )

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Cameron Williams, an Indiana Department of Correction ("IDOC")

inmate, filed this suit alleging that Defendants Officer David Archer, Officer Cole

Banta, Nurse Juanita Chattin, Dr. Samuel Byrd, Dr. Michael Mitcheff, Wexford of

Indiana LLC, and Centurion of Indiana were deliberately indifferent to a serious

medical need – namely, a broken thumb – in violation of the Eighth Amendment. Mr.

Williams also alleged that Defendant Thomas Wellington addressed grievances

regarding Plaintiff's medical care in a way that violated the Fourteenth Amendment's

Equal Protection Clause.  All defendants have moved for summary judgment. Dkts.

[117] and [123]. For the reasons below, the motions are **GRANTED** as to Officer Archer, Officer Banta, Dr. Mitcheff, Wexford, Centurion, and Wellington, and **DENIED** as to Dr. Byrd and Nurse Chattin.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to

properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Mr. Williams did not respond, with either argument or citation to any evidence, to the motions for summary judgment as to Defendants Wellington, Dr. Mitcheff, and Centurion. Accordingly, facts alleged in the motions as to those defendants are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Williams and draws all reasonable inferences in his favor. *See Khungar*, 985 F.3d at 572–73.

Mr. Williams is and was at all relevant times an inmate at Wabash Valley Correctional Facility ("WVCF"), an IDOC prison. Wexford was the statewide contracted medical care provider for IDOC facilities until June 30, 2021, after which time Centurion took over the contract for provision of medical care.

On Friday, August 14, 2020, at approximately 4:15 p.m., Mr. Williams's left hand—his dominant hand—was caught in his cell door as it was being closed by

Officer Archer from the control room.[1] Dkt. 141, p. 5. After the door was re-opened after 10-15 seconds so Mr. Williams could remove his hand and he saw that it was seriously injured, he began yelling to Officers Banta and Archer for medical attention. Dkt. 117-1, p. 132. After about 20 to 30 minutes, Officer Banta re-opened Mr. Williams's cell door and saw his injured hand. Officer Banta ordered Mr. Williams to return to his cell, and told Mr. Williams that a nurse was on the way. *Id.* at 137-38.

Nurse Chattin examined Mr. Williams's hand at about 5:30 p.m. after viewing a video of the incident. Dkt. 141, p. 5. Mr. Williams said he thought his hand and/or thumb might be broken, and Nurse Chattin agreed that it looked that way. *Id.* But she said that she was getting ready to leave for the day, and Dr. Byrd had already left for the weekend, so she was unsure what to do. Dkt. 117-1, p. 26. Nurse Chattin also told Mr. Williams that she normally would refer someone with an injury like his to the doctor immediately, if it was not nearly the weekend. Dkt. 141, p. 6. Nurse Chattin gave Mr. Williams an ACE bandage but did not apply it herself, told him to use ice and keep his hand elevated, and gave him 2 Tylenol tablets. Dkt. 141, p. 6. She told Mr. Williams that she would arrange for him to have additional pain medication over the weekend, but she did not do so. *Id.*

Nurse Chattin's notes of her examination state that Mr. Williams was unable to move his left thumb, that he was saying the pain was 8 out of 10, and that the apex of his thumb and forefinger were significantly swollen. Dkt. 125-5, pp. 3-4. The notes do not mention suspicion of a fracture. At about 6:30 p.m., before leaving work, Nurse

---

[1] Mr. Williams does not argue that Officer Archer acted intentionally or even recklessly.

Chattin emailed Dr. Byrd about Mr. Williams and several other patients she had seen that afternoon. Dkt. 125-1, p. 2. She asked if she should arrange for Mr. Williams's hand to be x-rayed. *Id.* She did not attempt to call an on-call physician for treatment advice.

On August 15, 2020, shortly after midnight, Mr. Williams submitted a healthcare request form stating that Nurse Chattin had promised to arrange for him to receive additional pain medication but had not done so. Dkt. 145, p. 18. On August 19, 2020, Nurse Chattin responded to the request stating, "Xray & Tylenol ordered." *Id.*

Dr. Byrd responded to Nurse Chattin's email on Monday morning, August 17, authorizing an x-ray for Mr. Williams's hand. *Id.* On August 18, 2020, WVCF radiology technician[2] Nancy Hunt and Dr. Byrd examined the x-ray taken of Mr. Williams's hand and they believed it showed a fracture of his thumb. Dkt. 125-5, p. 6. Dr. Byrd told Mr. Williams that he and Hunt thought the x-ray showed a thumb fracture but would await confirmation from an outside radiologist. Dkt. 117-1 pp. 46, 51. On that same date, Dr. Daniel Altman, the outside radiologist, reported that "[t]here is no fracture or dislocation." Dkt. 125-5, p. 47. Rather, he believed there were osteophytes[3] in the thumb/first finger joint. *Id.* After receiving Dr. Altman's analysis,

---

[2] The Medical Defendants originally identified Hunt as a "pharmacy technician" in their summary judgment brief. Dkt. 124, p. 5. Mr. Williams pointed out in his response that she is referred to as a radiology technician in the medical records. The Medical Defendants do not dispute this in their reply brief.

[3] An osteophyte is a bony outgrowth or protuberance associated with osteoarthritis. *See* STEDMAN'S MEDICAL DICTIONARY 638450, 637280 (2014).

Dr. Byrd thought that Mr. Williams's injury might have aggravated an underlying arthritic condition. *Id.* at 7. Dr. Byrd prescribed Prednisone and Tylenol, and gave Mr. Williams a splint for his thumb and advised him to use it for 3 weeks. *Id.*

On September 2, 2020, Dr. Byrd saw Mr. Williams for a chronic care visit associated with his hypertension, prediabetes, and an abdominal wall defect. *Id.* at 6. He also addressed Mr. Williams's thumb. *Id.* Mr. Williams reported that the splint and Prednisone had not been helpful. *Id.* at 7. Dr. Byrd noted that the thumb injury was "problematic" because Mr. Williams is left-handed. *Id.* at 6. The range of movement for the thumb was "severely limited." *Id.* Dr. Byrd's attempts to manipulate the thumb were extremely painful. *Id.*; Dkt. 145, p. 7. Mr. Williams felt something move inside his thumb while Dr. Byrd was manipulating it, and Dr. Byrd stated, "I felt something move in there but I don't know what it was." Dkt. 145, p. 7. After this visit, Dr. Byrd ordered more x-rays for Mr. Williams's hand because Dr. Byrd "would have expected significant improvement if minor injury at this point." Dkt. 125-5, p. 8. Again, after reviewing the new x-rays Dr. Altman still did not believe Mr. Williams's thumb was fractured. *Id.* at 48. Dr. Byrd continued Mr. Williams on Tylenol, a thumb splint, and recommended icing. *Id.* at 8. Dr. Byrd also noted, "He may need an MRI if this amount of pain persists." *Id.*

On September 24, 2020, Dr. Byrd saw Mr. Williams again. *Id.* at 10. It appears that Dr. Byrd developed suspicions about Mr. Williams's injury since the previous visit. In particular, the notes from this visit state that Dr. Byrd had confirmed with a Sergeant that the cell doors at WVCF do not close quickly. *Id.* Also, Dr. Byrd had

spoken with another inmate about the likelihood of one's hand getting crushed in a closing cell door, who said "[t]hat sounds like some intentional shit." *Id.* Dr. Byrd "suspect[ed] malingering here on some level" and that Mr. Williams was seeking "secondary gain." *Id.* at 12. Dr. Byrd also told Mr. Williams directly during this visit that he suspected him of "faking." Dkt. 145, p. 10. Mr. Williams reported no improvement in his thumb, and Dr. Byrd's attempts to manipulate it were still extremely painful. Dkt. 125-5 at 10. At this point, Dr. Byrd thought Mr. Williams's symptoms might be caused by either De Quervain's tenosynovitis or arthritis. Dkt. 125-5 at 12. Dr. Byrd prescribed the anti-inflammatory Mobic for Mr. Williams, in addition to keeping him on Tylenol. *Id.* Mr. Williams also requested during this visit to be referred to a hand specialist, which was refused because Dr. Byrd did not think he had had enough onsite evaluation yet. *Id.* at 12.

Mr. Williams's next visit with Dr. Byrd was on November 6, 2020. *Id.* at 14. Mr. Williams was unable to touch his thumb to any of his other fingertips and reported that the Mobic had not helped his pain. *Id.* Dr. Byrd's notes from this visit state in part:

> Difficult to objectively determine what is causing such significant pain in thumb. . . . I assumed his arthritic condition was exacerbated by reported injury, however, I would have expected significant improvement by now. Again, he has exam findings consistent with De Quervain's tenosynovitis, but I would have expected improvement with conservative measures to date and we have seen very little. Rest of exam limited by pain per patient.

*Id.* at 16. Dr. Byrd continued Mr. Williams on the Mobic and thumb splint and now also referred him to physical therapy. *Id.*

Mr. Williams next saw Dr. Boyd on February 11, 2021. Dkt. 125-5, p. 18. Although Dr. Boyd's notes state that Mr. Williams reported his thumb was "a little better" and that Prednisone helped his pain better than Mobic, Mr. Williams denies saying either. Dkt. 125-5, pp. 18 and 20; Dkt. 145 p. 8. Rather, Mr. Williams says he told Dr. Byrd that he was still experiencing significant pain and that both Prednisone and Mobic were ineffective. Dkt. 145, p. 8.

On March 9, 2021, Mr. Williams terminated his participation in physical therapy. Dkt. 125-5, p. 23. He told the physical therapist that he was not improving as much as he hoped and wanted to be referred to a specialist for further evaluation. *Id.* The therapist indicated they would recommend to a physician that Mr. Williams be evaluated by a hand specialist. *Id.*

Despite this recommendation, Dr. Byrd did not see Mr. Williams again until July 20, 2021. Dkt. 125-2, p. 5. Mr. Williams discussed knee pain during this visit but not his thumb. *Id.*

September 23, 2021, was Mr. Williams's next visit with Dr. Byrd. Dkt. 125-5 at 41. His thumb was still very painful and only had a limited range of motion. *Id.* After this visit, Dr. Byrd ordered new x-rays and decided to consult a company called RubiconMD. *Id.* at 41-42. "RubiconMD is a virtual platform that allows primary care physicians to expedite and streamline provision of medical care by obtaining initial opinions from specialty providers based on medical record review." Dkt. 125-2, p. 6. After receiving a response from RubiconMD, Dr. Byrd submitted a referral request

for Mr. Williams to have a hand surgery consultation with UAP Hand Clinic. *Id.* The referral request was approved the next day. *Id.*

Mr. Williams first saw Dr. Douglas McGuirk at UAP on November 2, 2021. Dkt. 145, pp. 97-98. Dr. McGuirk recommended that Dr. Byrd order an MRI of Mr. Williams's left thumb, which did occur. *Id.* Ultimately, Dr. McGuirk concluded that Mr. Williams did indeed have a fracture "with malunion" in the first metacarpal bone in his left hand – that is, the bone connecting the thumb to the wrist. *Id.* at pp. 119-120. Dr. McGuirk first attempted to treat the injury with a steroid injection on January 11, 2022. *Id.*

When this was unsuccessful, Dr. McGuirk operated on the thumb on April 6, 2022. *Id.* at 137. Dr. McGuirk's post-op discharge instructions stated in part, "[r]ecommended pain medication is oxycodone or hydrocodone for 5-7 days as needed." *Id.* at 138. When Mr. Williams returned to WVCF, however, Dr. Byrd instead ordered that Mr. Williams be given 30-60 mg of codeine. Dkt. 125-2, p. 8. Mr. Williams complained to Deputy Warden Gilmore that he was not receiving adequate post-op pain medication, and Deputy Warden Gilmore contacted Dr. Byrd. *Id.* Dr. Byrd responded by noting that codeine was readily available at WVCF and oxycodone was not. *Id.* Dr. Byrd

> further explained that after providing Mr. Williams the full seven days of opiate analgesic, I exercised my professional judgment to prescribe APAP [acetaminophen] and an NSAID Mobic to control post-operative pain in this case rather than further use of opiates in consideration of Mr. Williams's lengthy history of polysubstance abuse, which included opiate addiction and snorting heroin a couple of times a week as recently as 2018.

9

*Id.* Mr. Williams denies having a substance abuse problem. But, he does admit that he told WVCF mental health personnel, while trying to gain admittance to the Recovery While Incarcerated program[4], that he had used heroin by snorting it in 2018. Dkt. 145, p. 8. As indicated by Mr. Williams's incarceration records on the IDOC website, this apparently would have been in between his release from incarceration for prior offenses in 2017 and re-incarceration for new offenses in 2019.

Mr. Williams required a second surgery to address his thumb, which was conducted on January 20, 2023. Dkt. 145, p. 206.

Mr. Williams has designated evidence of his multiple healthcare requests and grievances he submitted during the relevant time frame regarding his thumb—most of which resulted in nurse visits and not visits with Dr. Byrd. *See generally* dkt. 145, pp. 13-222. WVCF Grievance Specialist Wellington denied Mr. Williams's grievances about the treatment of his thumb injury because of multiple technical mistakes on the grievance forms. Dkt. 117-3, p. 2. Wellington was not aware of Mr. Williams's race until this lawsuit was filed. *Id.*

Dr. Mitcheff was the statewide medical director for Wexford from June 2018 until the end of Wexford's IDOC contract in June 2021. Dkt. 125-3, p. 1. Dr. Mitcheff did not have any personal involvement in Mr. Williams's medical care, and neither received nor denied any requests that Mr. Williams be referred for off-site or specialist treatment. *Id.* at p. 2. Dr. Mitcheff did approve Dr. Byrd's September 2020

---

[4] Recovery While Incarcerated is a "comprehensive addiction treatment program" offered by the IDOC. *See* https://www.in.gov/idoc/medical/addiction-recovery (last visited July 9, 2024).

request for Mr. Williams to receive a specialized thumb brace. *Id.* Dr. Mitcheff also approved Dr. Byrd's October 2020 request that Mr. Williams receive a 30-day Mobic prescription. *Id.* at 3. After reviewing Mr. Williams's medical records, Dr. Mitcheff believes "most likely, that the radiologist from September and October 2020 simply missed the metacarpal fracture" but that Dr. Byrd appropriately relied on the radiologist's opinion and offered a proper course of treatment for Mr. Williams. *Id.* at 4.

Mr. Williams filed a complaint on May 2, 2022, which he twice amended. Dkts. 2, 10, 31. The Court screened Mr. Williams's complaints and ultimately allowed Eighth Amendment deliberate indifference claims to proceed against Dr. Mitcheff, Dr. Byrd, Nurse Chattin, Officer Archer, Officer Banta, Wexford (for the period before July 1, 2021), and Centurion (for the period on and after July 1, 2021). Dkt. 36, p. 7. The Court also found that Mr. Williams had adequately stated a Fourteenth Amendment Equal Protection Clause claim against Wellington, based on allegations that Wellington improperly handled grievances about Mr. Williams's medical care based on race. *Id.*

On January 8, 2024, Defendants Archer, Banta, and Wellington (the State Defendants) filed a motion for summary judgment. Dkt. 117. In his response to this motion, Mr. Williams did not respond to Wellington's arguments that he is entitled to summary judgment. Dkt. 140. On January 22, 2024, Defendants Dr. Byrd, Nurse Chattin, Dr. Mitcheff, Wexford, and Centurion (the Medical Defendants) filed a separate motion for summary judgment. Dkt. 123. In his response to this motion, Mr.

11

Williams did not respond to Dr. Mitcheff's and Centurion's arguments that they are entitled to summary judgment. Dkt. 144.

### III.
### Discussion

**A. Applicable Law**

**1. Deliberate Indifference**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

There is no dispute by any Defendant that Mr. Williams's broken thumb was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that a defendant acted with deliberate indifference—that is, that he or she "consciously disregarded a serious risk to [Mr. Williams]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Williams "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

*See also Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("Persisting in treatment known to be ineffective can constitute deliberate medical indifference,

provided that the doctor was subjectively aware that the treatment plan was ineffective.").

## 2. Municipal Policy Claims

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To prevail on a claim against either Wexford or Centurion, Mr. Williams must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Wexford or Centurion custom or policy or failure to implement a needed policy. *Id.* Wexford and Centurion cannot be held liable under the common-law theory of respondeat superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

Further, a "pivotal requirement" for any custom claim is a showing of widespread constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). Although it is not "impossible" for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, "it is necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Id.* at 426−27 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)).

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause protects one from disparate treatment based on membership in a protected class. *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). To state an Equal Protection claim, a plaintiff must allege that (1) he was a member of a protected class, (2) he was treated differently from a similarly situated member of an unprotected class, and (3) the defendants were motivated by a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). Simply receiving different or unfair treatment is not enough to raise an Equal Protection violation. *Sherwin Manor Nursing Ctr. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir. 1994); *Huebschen v. Department of Health & Soc. Servs.*, 716 F.2d 1167, 1171 (7th Cir. 1983).

### B. Nurse Chattin

The Court first addresses the claims against Nurse Chattin. "As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). But she still maintains "an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015). Further, a nurse may be liable if she acts independently rather than pursuant to a physician's orders. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010).

Viewing the evidence in a light most favorable to Mr. Williams, a jury could find that Nurse Chattin was deliberately indifferent to a serious medical need by failing to take more immediate action to address his injury. She watched the video to

15

confirm that Mr. Williams had indeed had his hand crushed in a closing cell door and agreed with him that his hand or thumb appeared to be broken. She also stated that if the weekend were not approaching and Dr. Byrd had not already gone home for the weekend, she would have recommended that he see a doctor immediately. Her notes and apparently her message to Dr. Byrd did not convey her and Mr. Williams's suspicions that his thumb was broken. *Cf. Jackson v. Anderson*, 770 F. App'x 291, 292–93 (7th Cir. 2019) (finding that nurses were not required to adopt plaintiff's diagnosis of a broken bone because the plaintiff never complained of any pain and their examination revealed no signs of a broken bone such as swelling or bruising). She had the option to call an on-call doctor for further advice, but did not do so. Instead, she wrote an email to Dr. Byrd that she apparently knew he would not read until Monday morning at the earliest, and it was not until the next Tuesday that the x-ray was taken. Nurse Chattin also did not ensure that the ACE bandage she gave Mr. Williams was properly applied so as to stabilize his thumb, but told Mr. Williams to apply it himself.

Moreover, despite suspecting Mr. Williams had a broken hand or thumb and recognizing that he described his pain as 8 out of 10, she arranged for him to have a total of 2 Tylenol pills for pain relief. She left him without any more access to any pain medication for well over 2 days despite telling Mr. Williams that she would arrange for him to have some pain medication over the weekend. Even if Tylenol was all she personally could give him, and might not have been very effective given the severity of the injury, it would have been better than nothing. A jury could reasonably

conclude that the delay in treatment caused Mr. Williams to unnecessarily suffer substantial pain at least until the x-ray was taken the following Tuesday. *See Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020); *Reck*, 27 F.4th at 483 (delay in treatment may rise to level of deliberate indifference if it unnecessarily prolongs inmate's pain); *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (two-day delay in treating dislocated finger attributed to defendant not wanting to change schedule and miss New Year celebrations adequately stated claim of deliberate indifference for screening purposes); and *Lewis v. McLean*, 864 F.3d 556, 563-64 (7th Cir. 2017) (ignoring inmate's painful back spasms for 1.5 hours adequately stated claim of deliberate indifference to survive summary judgment)

Because there are material disputes of fact as to whether Nurse Chattin acted appropriately in response to Mr. Williams's serious medical needs, summary judgment must be denied as to Mr. Williams's claims against her.

**C. Dr. Byrd**

Mr. Williams's claims against Dr. Byrd are related to (1) the over one-year delay in referring him to a hand surgery specialist following his injury; and (2) for not following Dr. McGuirk's recommendation that he receive oxycodone or hydrocodone pain medications for 5 to 7 days following his first hand surgery.

Regarding the extensive delay in referring Mr. Williams to a specialist, a jury could find that Dr. Byrd was deliberately indifferent to Mr. Williams's serious medical needs in violation of the Eighth Amendment. The primary thrust of Dr. Byrd's argument is that he properly relied on radiologist Dr. Altman's interpretation of the

first two rounds of x-rays of Mr. Williams's hand, opining that they did not show any fracture, and the ensuing course of treatment for over a year was appropriate in light of Dr. Altman's opinion. In other words, Dr. Byrd contends he was not deliberately indifferent for conservatively treating Mr. Williams's thumb pain for well over a year as the suspected result of either an arthritic condition or De Quervain's tenosynovitis, and not a fracture.

Generally, a doctor will not be deliberately indifferent if he follows the treatment decisions of a specialist. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 463 (7th Cir. 2020). But he may be liable if a specialist's treatment decisions are "blatantly inappropriate[,]" and the doctor carries them out anyway. *Id.* Certainly, a generalist physician can and arguably should rely on the opinion of a specialist when determining a course of treatment for an inmate. But such reliance should not be open-ended and never-ending. A reasonable jury could conclude that no later than November 6, 2020, and possibly several weeks earlier, it was no longer acceptable for Dr. Byrd to trust Dr. Altman's x-ray evaluations without seeking another specialist's input.

Mr. Williams, Nurse Chattin, Radiology Technician Hunt, and Dr. Byrd all seemed certain at first that Mr. Williams's thumb was indeed fractured. And it is evident that Dr. Byrd himself started having doubts about the accuracy of Dr. Altman's x-ray evaluations as early as September 2, 2020, because he ordered a repeat of x-rays, which again were interpreted by Dr. Altman as not showing any fractures. But Dr. Byrd noted at this time that he "would have expected significant

18

improvement if minor injury at this point." Dkt. 125-5, p. 8. Also, he told Mr. Williams that he felt movement in the thumb when manipulating it. And he observed that Mr. Williams "may need an MRI if this amount of pain persists." *Id.* Mr. Williams did repeatedly and consistently report a very high level of pain and inability to use his thumb for weeks and months thereafter and that none of the "conservative" treatments were working, but Dr. Byrd persisted in a "conservative" course of treatment, did not order additional testing, and refused Mr. Williams's request to see a hand surgery specialist.

After the November 6, 2020, visit with Mr. Williams, Dr. Byrd expressly acknowledged that he "would have expected significant improvement by now" with the "conservative measures" employed up to that point. *Id.* at 16. Nonetheless, Dr. Byrd persisted in a "conservative" course of treatment and referred Mr. Williams to physical therapy.

From this evidence, regardless of Dr. Altman's initial x-ray evaluations, a jury could conclude that Dr. Byrd persisted in ineffective treatment by failing to refer Mr. Williams to a specialist when his condition did not improve over the course of months. *See Pyles*, 771 F.3d at 412 (noting "if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent[.]") (cleaned up); *Machicote*, 969 F.3d at 828 (persisting in ineffective treatment may demonstrate deliberate indifference). Thus, a jury also could find that Dr. Byrd was deliberately indifferent to Mr. Williams's

serious medical needs from sometime in the fall of 2020 until he referred Mr. Williams to a specialist in September 2021, resulting in significant and prolonged pain and limited use of Mr. Williams's dominant hand for over a year.

The Court acknowledges that Dr. Byrd did not completely ignore Mr. Williams's complaints regarding his thumb and was not "deliberately indifferent" to his injury in that sense. Moreover, there was a period of several months in 2021, after Mr. Williams discontinued physical therapy, when he did not see Dr. Byrd again, which does not appear to be Dr. Byrd's fault. And when Mr. Williams did see Dr. Byrd in July 2021, he did not present any complaints about his thumb. Finally, even after Mr. Williams was referred to a specialist in September 2021, the specialist himself did not immediately order surgery for the thumb but instead ordered further testing and more conservative treatment for several months. Some amount of delay in treatment here seems to have been inevitable. But, viewing the evidence in a light most favorable to Mr. Williams, there is a genuine issue of material fact as to whether there was an excessive delay in treatment caused by Dr. Byrd's continued reliance on Dr. Altman's x-ray evaluations that a jury might find to be "blatantly inappropriate." *Donald*, 982 F.3d at 463. Summary judgment regarding this claim would be premature.

Regarding Dr. Byrd's refusal to prescribe oxycodone or hydrocodone to Mr. Williams's following his first surgery, the Court comes to a different conclusion. Opiate addiction and abuse is a very real and serious concern, and could be even more so in a prison setting. Certainly, there may be times when medications such as

oxycodone or hydrocodone must be prescribed anyway. But the mere fact that Dr. McGuirk recommended such a prescription for Mr. Williams does not mean that Dr. Byrd was required to follow that recommendation.

Courts "routinely have rejected claims . . . where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). Specifically, a prison doctor is not required to follow a non-prison doctor's recommendation for a narcotic pain medication prescription. *See id.* (citing *Burton v. Downey*, 805 F.3d 776, 785-86 (7th Cir. 2015)). "The administration of pain killers requires medical expertise and judgment. Using them entails risks that doctors must consider in light of the benefits." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

Mr. Williams has not shown that Dr. Byrd's decision to prescribe codeine instead of oxycodone or hydrocodone was a substantial departure from acceptable professional judgment. Most important, Dr. Byrd had legitimate concerns about the potential for abuse of or addiction to a stronger opiate by Mr. Williams. Mr. Williams denies having a substance abuse problem, but in the same breath also admits he attempted to enter IDOC's Recovery While Incarcerated substance abuse program when he came into WVCF and that he used heroin in 2018, while briefly out of IDOC custody.

Mr. Williams also attempts to argue that Dr. Byrd in fact could not prescribe either oxycodone or hydrocodone – or any Schedule II through V controlled substance

21

– after the first surgery. However, the designated evidence demonstrates that Dr. Byrd was in fact licensed and able to prescribe such drugs at the time in question. Dkt. 145, pp. 299-301. To the extent the Medical Defendants moved to strike Mr. Williams's designated evidence on this issue under Fed. R. Civ. P. 12(f) as "impertinent" or "scandalous," the Court denies that request because the designated material appears to be entirely a matter of public record and not false.

In short, no reasonable jury could find that Dr. Byrd was deliberately indifferent with respect to his decision to prescribe codeine rather than a stronger opiate after Mr. Williams's first surgery. Dr. Byrd is entitled to summary judgment regarding this particular claim.

### D. Wexford

Mr. Williams asserts that the delay in receiving adequate treatment for his broken thumb was at least partly the result of an overall Wexford policy of prioritizing cost savings over patient care. In support thereof, he relates conversations he had with Dr. Byrd in which Dr. Byrd noted that it would cost money to refer him to a specialist and he would need to seek approval from Dr. Mitcheff for any such referral. He also cites multiple statements Wexford made in its contract proposal to the State of Indiana referring to its ability to control costs in its provision of medical care to IDOC inmates.

Mr. Williams's evidence does not establish the existence of an unconstitutional policy or custom on Wexford's part. There is no evidence, for example, that Dr. Byrd ever actually requested approval for off-site testing or a referral for Mr. Williams

while Wexford's contract was in effect or that any such request was denied. Wexford cannot be held liable under the common-law theory of respondeat superior for Dr. Byrd's actions or his failure to even attempt to seek approval for off-site testing or a referral. *See Howell*, 987 F.3d at 653. To the extent Mr. Williams is speculating that Dr. Byrd never sought a referral because he knew Dr. Mitcheff or others at Wexford would deny it, inferences supported only by "speculation or conjecture" will not suffice to defeat a motion for summary judgment. *Skiba v. Ill. Cent. R. R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018).

Additionally, the "puffery" in Wexford's contract proposal to the State of Indiana is standard language that many medical providers and insurers use, inside and out of the prison context. A claim to be "cost-effective" is not the same thing as saying cost-effectiveness will override adequate patient care. In any event, Wexford's contract proposal also contains references, for example, to its "stellar track record of adherence to contract terms *and clinical standards* . . . to ensure we are delivering the best possible service to *both client and patient*" and asserts that it "never den[ies] appropriate care." Dkt. 145, p. 313 (emphases added). The contract proposal is not evidence of an unconstitutional policy or policies on Wexford's part.

Finally, Mr. Williams asks the Court to take judicial notice of numerous federal lawsuits in which Wexford has been accused of having an unconstitutional policy of prioritizing cost over adequate medical care. However, although Federal Rule of Evidence 201 allows courts to take judicial notice of public records themselves, it generally does not allow judicial notice of disputed facts within those records. *See*

*Tobey v. Chibucos*, 890 F.3d 634, 647-48 (7th Cir. 2018). Wexford's litigation history in this and other federal courts is irrelevant to the factual question in this case of whether it had an unconstitutional policy of prioritizing cost savings over adequate medical care that resulted in injury to Mr. Williams.

Mr. Williams has not designated sufficient evidence to support an inference that a Wexford policy or custom caused him a constitutional injury. Thus, Wexford is entitled to summary judgment.

### E. Centurion

As noted, Mr. Williams failed to respond to or designate any evidence contrary to Centurion's argument that no policy or custom on its part caused him any injury. In fact, Mr. Williams testified in his deposition, "it wasn't Centurion's fault that I – because I had got services since Centurion, as far as getting my surgery done and this and that or whatever" and agreed with counsel's suggestion that Centurion could be dismissed as a defendant in this action. Dkt. 117-1, pp. 106-07. In light of this concession and the lack of any argument or evidence to the contrary, Centurion is entitled to summary judgment.

### F. Dr. Mitcheff

Mr. Williams also failed to respond to or designate any evidence contrary to Dr. Mitcheff's argument that he is entitled to summary judgment. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.

1995)). For this purpose, each defendant is considered independently. *Id.* There is no evidence that Dr. Mitcheff had any personal involvement in Mr. Williams's medical care, aside from approving Dr. Byrd's requests for a specialized splint and for a Mobic prescription. Dr. Mitcheff is entitled to summary judgment.

### G. Officers Archer and Banta

In his original complaint(s), Mr. Williams specified that he was suing Officers Archer and Banta for deliberate indifference based on their not "immediately request[ing] medical treatment for Plaintiff's injured hand . . . ." Dkt. 31, p. 2. The complaint(s) did not mention any alleged misconduct by Officers Archer and Banta on the weekend after the injury. Mr. Williams submitted interrogatories to Officers Archer and Banta that asked only about their actions on August 14, 2020. Dkt. 117-2. Mr. Williams's initial disclosures in discovery identified Officers Archer and Banta as potential witnesses, but only discussed expected testimony related to the initial injury and immediate aftermath. Dkt. 146-2, pp. 7-8. The State Defendants submitted interrogatories to Mr. Williams, requesting him to identify any and all evidence supporting his claims, where he failed to mention any alleged misconduct by Officers Archer and Banta on the weekend after August 14 or the existence of any evidence that would support such a claim. Dkt. 146-1.

In their summary judgment brief, Officers Archer and Banta solely argued that their actions in immediate response to Mr. Williams's injury were reasonable and not unduly delayed. In his response brief, Mr. Williams argued in part, "it should be the Defendants failure to not obtain medical treatment for Williams the rest of the

weekend that is the focus." Dkt. 1470, p. 18. In support thereof, Williams submitted a sworn declaration asserting that he requested additional medical care from Officers Archer and Banta 8 to 10 times over the weekend, which they ignored. Dkt. 141, p. 8.

In their reply brief, Officers Archer and Banta strenuously object to Mr. Williams's new allegations against them and asks the Court to disregard them. The Court agrees that these new allegations come much too late and could have been brought to these Defendants' attention much sooner. The Seventh Circuit has "recognized the principle that 'a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment.'" *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (quoting *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). "Specifically . . . parties cannot 'add entirely new factual bas[e]s ... not previously presented.'" *Id.* Based on this principle, the Court will disregard Mr. Williams's allegations regarding Officers Archer's and Banta's conduct after they had obtained medical assistance for him immediately after the injury.

Regarding the immediate response of Officers Archer and Banta, it is undisputed that about 20-30 minutes after Mr. Williams sustained the injury, Officer Banta told him that a nurse was on the way to examine him. It took Nurse Chattin another 30-45 minutes to arrive and examine Mr. Williams, but Officers Archer and Banta did not have direct control over how long it took Nurse Chattin to respond to their call for assistance. It is highly doubtful that Officers Archer and Banta could be held responsible for how long it took Nurse Chattin to arrive. *See Greeno v. Daley*,

414 F.3d 645, 656 (7th Cir. 2005) (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns.").

In any event, the Court concludes that no reasonable jury could find Officers Archer or Banta deliberately indifferent to a serious medical need of Mr. Williams, whether the delay is viewed as 20 minutes or a little over an hour. "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 434, 441 (7th Cir. 2010). "[A] non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition." *Id.* A relatively short delay, however, does not rise to the level of a constitutional violation. *See Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (one-hour delay in responding to claim of injury by rape in prison did not rise to level of constitutional violation).

Officer Banta acted reasonably promptly in requesting that a nurse come to his cell. He did not completely ignore Mr. Williams's requests for assistance. To the extent Mr. Williams faults Officer Archer for not independently seeking assistance, there was no need for him to do so once Officer Banta had already acted. Although the Court does not doubt that Mr. Williams experienced severe pain after his hand was caught in the cell door, it also was not a life-threatening injury and there is no

evidence that this relatively slight delay aggravated the condition. The Court also believes it is reasonable to assume that if a non-prisoner suffered a similar injury at home or elsewhere, it may easily take an hour before the person could be taken to a hospital or immediate care center and triaged by a nurse.

Mr. Williams has failed to designate sufficient evidence to show that Officers Archer or Banta were deliberately indifferent to his serious medical needs, and they are entitled to summary judgment.

### H. Grievance Specialist Wellington

Finally, Mr. Williams did not respond to Wellington's argument and evidence that Wellington is entitled to summary judgment. Wellington submitted an affidavit stating that he did not know of Mr. Williams's race when he rejected the grievances at issue. There being no evidence or argument to the contrary by Mr. Williams, there is no viable Equal Protection claim against Wellington and he is entitled to summary judgment.

## IV.
## Conclusion

The motion for summary judgment by the State Defendants – Officer Archer, Officer Banta, and Grievance Specialist Wellington – dkt. [117], is **GRANTED** in its entirety.

The motion for summary judgment by the Medical Defendants, dkt. [123] is **GRANTED** in its entirety as to Wexford, Centurion, and Dr. Mitcheff, and **GRANTED IN PART** as to Dr. Byrd with respect to the claim regarding pain medication after Mr. Williams's first surgery. It is **DENIED** as to Nurse Chattin in

its entirety, and as to Dr. Byrd with respect to the claim of an excessive delay in referring Mr. Williams to a hand surgery specialist. Those claims shall proceed.

The **clerk is directed** to terminate Officer Archer, Officer Banta, Grievance Specialist Wellington, Wexford, Centurion, and Dr. Mitcheff as defendants on the docket.

Mr. Williams has not previously requested that the Court recruit counsel on his behalf. Because it is the Court's preference that an incarcerated plaintiff be represented by counsel for purposes of a settlement conference or trial, the Court will attempt to recruit counsel to represent Mr. Williams. The **clerk is directed** to attach the Court's form motion for assistance with recruiting counsel to Mr. Williams's copy of this Order. Mr. Williams shall have through **August 12, 2024** in which to file this motion or to object to the recruitment of counsel on his behalf. After counsel is appointed, the Magistrate Judge is requested to hold a status conference to facilitate trial preparation and schedule a settlement conference.

**IT IS SO ORDERED.**

Date: 09/27/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

CAMERON T. WILLIAMS
882835
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only


Magistrate Judge Klump's Chambers